BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

ANTHONY P. NICASTRO
Acting Director

SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
United States Department of Justice
Civil Division
950 Pennsylvania Ave NW, Ofc 3631
Washington, D.C. 20530
202.307.1697
Sean.Skedzielewski@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CITY OF HUNTINGTON BEACH, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 8:25-cv-00026-SSS |
| | ) | |
| THE STATE OF CALIFORNIA, GAVIN | ) | STATEMENT OF INTEREST |
| NEWSOM, in his official capacity as | ) | ON BEHALF OF |
| Governor of the State of California, et al., | ) | THE UNITED STATES OF AMERICA |
| | ) | |
| Defendants. | ) | |
| | ) | |

# TABLE OF CONTENTS

STATUTORY AUTHORITY TO FILE STATEMENT OF INTEREST ..................................1

INTEREST OF THE UNITED STATES ...................................................................1

STATEMENT OF THE CASE...............................................................................3

    I.      STATUTORY AND REGULATORY BACKGROUND..........................................3

    II.     CALIFORNIA'S CALIFORNIA VALUES ACT....................................................7

ARGUMENT ...................................................................................................8

CALIFORNIA'S CALIFORNIA VALUES ACT VIOLATES THE SUPREMACY CLAUSE 8

    A.  CVA Unlawfully Regulates the Federal Government ......................................8

    B.  CVA Unlawfully Discriminates Against the Federal Government ...................11

    C.  CVA is Conflict Preempted by the Immigration and Nationality Act............16

    D.  8 U.S.C. § 1373 Expressly Preempts CVA's Restrictions on Information Sharing .......18

CONCLUSION................................................................................................25

CERTIFICATE OF SERVICE ............................................................................26

City of Huntington Beach at al. v. The State of California, et al.           U.S. DEPARTMENT OF JUSTICE
  8:25-cv-00026                                                950 Pennsylvania Ave NW
                                      i                                Washington, DC 20530

# TABLE OF AUTHORITIES
## Cases

*Arizona v. United States,*
  567 U.S. 387 (2012) ................................................................ passim

*Berger v. State of New York,*
  388 U.S. 41 (1967) ......................................................................... 10

*California v. Superior Ct. of California, San Bernardino Cnty.,*
  482 U.S. 400 (1987) ....................................................................... 21

*Chamber of Com. of United States v. Whiting,*
  563 U.S. 582 (2011) ....................................................................... 17

*City of Chicago v. Barr,*
  961 F.3d 882 (7th Cir. 2020) ......................................................... 23

*City of El Cenizo, Texas v. Texas,*
  890 F.3d 164 (5th Cir. 2018) ........................................................... 4

*City of Huntington Beach v. Becerra,*
  44 Cal. App. 5th 243 (2020) ............................................................ 8

*City of New York v. United States,*
  179 F.3d 29 (2d Cir. 1999) ......................................................... 3, 7

*Crosby v. Nat'l Foreign Trade Council,*
  530 U.S. 363 (2000) ....................................................................... 17

*Cunningham v. Neagle,*
  135 U.S. 1 (1890) ............................................................................ 9

*Davis v. Elmira Sav. Bank,*
  161 U.S. 275 (1896) ................................................................. 17, 18

*Dawson v. Steager,*

    586 U.S. 171 (2019) ................................................................ 11, 15

*Flatow v. Islamic Republic of Iran,*

    305 F.3d 1249 (D.C. Cir. 2002)............................................................ 1

*Galvan v. Press,*

    347 U.S. 522 (1954) ................................................................ 17

*Geo Group, Inc. v. Newsom,*

    50 F.4th 745 (2022) ................................................................ 8, 11, 14

*Gonzalez v. United States Immigr. & Customs Enf't,*

    975 F.3d 788 (9th Cir. 2020) ............................................................ 4

*Hines v. Davidowitz,*

    312 U.S. 52 (1941) ................................................................ 16, 17

*Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.,*

    452 U.S. 264 (1981) ................................................................ 20

*Johnson v. State of Maryland,*

    254 U.S. 51 (1920) ................................................................ 8

*Kentucky v. Dennison,*

    65 U.S. 66 (1860) ................................................................ 22

*Kleindienst v. Mandel,*

    408 U.S. 753 (1972) ................................................................ 3

*Lamar, Archer & Cofrin, LLP v. Appling,*

    584 U.S. 709 (2018) ................................................................ 22, 23

City of Huntington Beach at al. v. The State of California, et al.
  8:25-cv-00026

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave NW
Washington, DC 20530

iii

*Leslie Miller, Inc. v. State of Arkansas,*

    352 U.S. 187 (1956) ........................................................................... 8, 10

*Loughrin* v. *United States,*

    573 U.S. 351 (2014) ............................................................................ 23

*Mayo v. United States,*

    319 U.S. 441 (1943) ............................................................................ 8

*McHenry Cnty. v. Kwame Raoul,*

    44 F.4th 581 (7th Cir. 2022) ....................................................... 11, 13, 14

*M'Culloch v. State,*

    17 U.S. 316 (1819) ......................................................................... 8, 15

*Morales v. Trans World Airlines, Inc.,*

    504 U.S. 374 (1992) ............................................................................ 18

*Murphy v. Nat'l Collegiate Athletic Ass'n,*

    584 U.S. 453 (2018) ..................................................................... 19, 20, 21

*New York v. United States,*

    505 U.S. 144 (1992) ............................................................................ 21

*Nielsen v. Preap,*

    586 U.S. 392 (2019) ............................................................................ 17

*North Dakota v. United States,*

    495 U.S. 423 (1990) ....................................................................... 11, 13

*Printz v. United States,*

    521 U.S. 898 (1997) ....................................................................... 19, 21

*Reno v. Condon*,

   528 U.S. 141 (2000) ............................................................................... 19

*State v. Dep't of Just.*,

   951 F.3d 84 (2d Cir. 2020) ...................................................................... 7

*Truax v. Raich*,

   239 U.S. 33 (1915) ................................................................................. 17

*United States v. California*,

   314 F. Supp. 3d 1077 (E.D. Cal. 2018) .................................................. 22

*United States v. California*,

   No. 2:18-CV-721-WBS-DB, 2018 WL 5780003 (E.D. Cal. Nov. 1, 2018) ......................... 14

*United States v. Ferrara*,

   847 F. Supp. 964 (D.D.C. 1993)............................................................... 9

*United States v. Fresno Cnty.*,

   429 U.S. 452 (1977) ............................................................................... 15

*United States v. King Cnty., Washington*,

   122 F.4th 740 (9th Cir. 2024) ..................................................... passim

*United States v. Washington*,

   596 U.S. 832 (2022) ............................................................. 11, 12, 15, 16

*Washington v. United States*,

   460 U.S. 536 (1983) ............................................................................... 13

## STATUTES

6 U.S.C. § 482(b) ....................................................................................... 6

8 U.S.C. § 1101............................................................................................ 3

8 U.S.C. § 1226(c) ............................................................................................... 4, 9

8 U.S.C. § 1226(c)(3) .......................................................................................... 4, 9

8 U.S.C. § 1226(d)(1)(A) .......................................................................................... 5

8 U.S.C. § 1226(d)(1)(B) .......................................................................................... 5

8 U.S.C. § 1226(f) .................................................................................................. 21

8 U.S.C. § 1231(a)(4)(A) ....................................................................................... 23

8 U.S.C. § 1252c ....................................................................................................... 6

8 U.S.C. § 1305 ...................................................................................................... 24

8 U.S.C. § 1306 ...................................................................................................... 24

8 U.S.C. § 1324(c) .................................................................................................... 6

8 U.S.C. § 1357(d) .................................................................................................... 4

8 U.S.C. § 1357(g) .................................................................................................... 5

8 U.S.C. § 1357(g)(1) ............................................................................................... 5

8 U.S.C. § 1357(g)(3) ............................................................................................... 5

8 U.S.C. § 1357(g)(9) ............................................................................................... 5

8 U.S.C. § 1373 ........................................................................................... 6, 7, 18

8 U.S.C. § 1373(a) ..................................................................................... 18, 19, 22

8 U.S.C. § 1373(a)-(b) .............................................................................................. 6

8 U.S.C. § 1373(c) .......................................................................................... 7, 23

8 U.S.C. § 1644 ........................................................................................................ 6

8 U.S.C. §§ 237(a)(1)(C) ....................................................................................... 10

8 U.S.C. §§ 1226 .......................................................................................... 3, 4, 18

8 U.S.C. §§ 1226(a) ............................................................................................... 18

8 U.S.C. §§ 1324 & 1373 .................................................................................... 1

8 U.S.C.A. § 1357 .............................................................................................. 12

28 U.S.C. § 517 ................................................................................................... 1

34 U.S.C. § 41307 ............................................................................................. 19

42 U.S.C. § 5779(a) ........................................................................................... 19

49 U.S.C. App. § 1305(a)(1) (1988 ed.) ...................................................... 18, 19

Cal. Gov't Code § 7282.5 .................................................................................. 13

Cal. Gov't Code § 7283.1 ............................................................................ 10, 13

Cal. Gov't Code § 7284(a)(1)(E) ........................................................................ 9

Cal. Gov't Code § 7284.6(a) ............................................................................. 10

Cal. Gov't Code § 7284.6(a)(1) ..................................................................... 7, 24

Cal. Gov't Code § 7284.6(a)(1)(A) ..................................................................... 7

Cal. Gov't Code § 7284.6(a)(1)(B) ............................................................... 12, 18

Cal. Gov't Code § 7284.6(a)(1)(C) .................................................................... 12

Cal. Gov't Code § 7284.6(a)(1)(D) .................................................................... 12

Cal. Gov't Code § 7284.6(a)(6) ..................................................................... 7, 12

Cal. Gov't Code § 7284.6(e) .............................................................................. 24

Cal. Gov't Code §§ 7284.6(a)(1)(5) ................................................................... 15

U.S.C. § 518(b) ................................................................................................... 1

U.S.C. § 1226(a) .................................................................................................. 9

U.S.C. § 1357(g)(10) ........................................................................................... 5

U.S.C. §§ 1226 or 1231(a) ................................................................................... 4

# REGULATIONS

8 C.F.R. § 287.7 .................................................................................................. 4

8 C.F.R. § 287.7(a) ............................................................................................. 4

Pub L. No. 119-1 ................................................................................................. 4

City of Huntington Beach at al. v. The State of California, et al.
  8:25-cv-00026

viii

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave NW
Washington, DC 20530

## STATUTORY AUTHORITY TO FILE STATEMENT OF INTEREST

Pursuant to 28 U.S.C. § 517, the United States files the following Statement of Interest in support of Plaintiffs City of Huntington Beach, Huntington Beach City Council, Huntington Beach Police Department, Huntington Beach Police Chief, and Sheriff Chad Bianco's claims in their second amended complaint against Defendants the State of California, Gavin Newsom, Robert Bonta, and Does 1-50, for violations, *inter alia*, of Article VI, Clause 2, and Article I, Section 8, Clause 4 of the United States Constitution, and U.S. Immigration Laws under 8 U.S.C. §§ 1324 & 1373.

Under 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." Under 28 U.S.C. § 518(b), "[w]hen the Attorney General considers it in the interests of the United States, he may personally conduct and argue any case in a court of the United States in which the United States is interested, or he may direct the Solicitor General or any officer of the Department of Justice to do so." These statutes provide a mechanism for the United States to submit its views in cases in which the United States is not a party but nonetheless has a vested interest in the case. *See, e.g.*, *Flatow v. Islamic Republic of Iran*, 305 F.3d 1249, 1252-53 & n.5 (D.C. Cir. 2002).

## INTEREST OF THE UNITED STATES

The United States has a substantial interest in, and long history of, working cooperatively with state and local governments on a range of law-enforcement priorities, including immigration. These cooperative efforts are critical to enabling the federal

government to identify and remove the hundreds of thousands of individuals who violate immigration laws each year, including many thousands who are convicted of serious crimes. This undertaking fulfills the Executive Branch's responsibility to enforce federal statutes and to protect public safety.

California's "California Values Act" ("CVA") strikes at the heart of this cooperative scheme. The Act, by intent and design, interferes with the federal government's enforcement of federal immigration law. And it violates the Supremacy Clause of the United States Constitution.

California's enforcement of the CVA against Plaintiffs represents an important decision by the State to prevent law enforcement agencies ("LEAs") from cooperating with federal immigration enforcement. Enforcement of the so-called "Values Act" is unlawful, because the Act itself is unlawful.

The latest consequence of California's enforcement of the CVA are the riots in Los Angeles that began on June 6, 2025. By prohibiting LEAs from ensuring the safe transfer of criminals from state to federal custody in the secure environment of detention facilities, the CVA has left ICE no choice but to arrest those criminals in neighborhoods throughout Los Angeles, putting agents and detainees alike at higher risk. Agitators have used those lawful arrests as a pretext to riot, loot, and attack law enforcement officers.

California cannot prevent LEAs from cooperating with the federal government to enforce federal law. This Court should enjoin California from doing so and should declare the CVA unconstitutional.

The United States takes no position on the merits of any other issue not addressed in the attached Statement of Interest.

# STATEMENT OF THE CASE

## I.    STATUTORY AND REGULATORY BACKGROUND

The federal government "has broad, undoubted power over the subject of immigration and the status of aliens," based in part on the federal government's power to "establish a[] uniform Rule of Naturalization," and in part on the federal government's inherent power as a sovereign to police its borders and exclude or deport removable aliens. *Arizona v. United States*, 567 U.S. 387, 394 (2012) (quoting U.S. Const. art. I, § 8, cl. 4); *see also Kleindienst v. Mandel*, 408 U.S. 753, 765-66 & n.6 (1972). In exercising those powers, Congress established through the Immigration and Nationality Act ("INA") a cooperative system where state and local governments play a role in enforcing the federal immigration laws. *See, e.g.*, 8 U.S.C. § 1101 *et seq*. Indeed, "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. As the Second Circuit has explained: "Absent any cooperation at all from local officials," the immigration system—like other federal programs—"may fail or fall short of [its] goals[.]" *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999).

At every turn, the INA's structure and design reflects a system where the federal government is able to partner with state and local governments regarding immigration. A prime example is the "detainer" scheme Congress has established. Specifically, the INA permits state and local law enforcement officers to cooperate with the federal government by responding to requests for assistance contained in federal "immigration detainers," including requests issued by U.S. Customs and Border Protection ("CBP") and ICE, the components of DHS that are responsible for immigration enforcement at the border and in the interior of the country, respectively. *See* 8 U.S.C. §§ 1226, 1357. An immigration detainer provides notice of DHS's

intent to assume custody of a removable alien detained in the custody of another law enforcement agency and seeks state or local cooperation in that effort. *See* 8 U.S.C. §§ 1226, 1357(d); 8 C.F.R. § 287.7(a), (d). Further, on January 29, 2025, the President signed into law the Laken Riley Act. *See* Laken Riley Act, Pub L. No. 119-1, 139 Stat. 26 (2025). Among other things, the Laken Riley Act amended 8 U.S.C. § 1226(c) to provide that the "Secretary of Homeland Security shall issue a detainer for an alien described in paragraph (1)(E)[.]" 8 U.S.C. § 1226(c)(3). Acting on its long-recognized authority to arrest and detain noncitizens, DHS promulgated 8 C.F.R. § 287.7, describing detainers and expressing that they are issued pursuant to 8 U.S.C. §§ 1226 and 1357.

An immigration detainer asks a law enforcement agency, state, or locality to: (1) notify DHS of the alien's release date from local custody; and (2) detain the alien for up to 48 hours beyond when the individual would otherwise be released on state charges. DHS issues detainers based on its determination that it has probable cause to believe that the individual is removable.[1] Immigration detainer requests ensure the safe transfer of criminals from state to federal custody in a secure environment, rather than requiring federal officials to make more dangerous arrests in public or private places. 8 C.F.R. § 287.7(a), (d); *see also* 8 U.S.C. § 1357(d) (in certain circumstances DHS "shall promptly determine whether or not to issue such a detainer" "in the case of an alien who is arrested by a Federal, State, or local law enforcement official" for certain criminal violations).

---

[1] DHS detainers must be accompanied by a signed administrative warrant of arrest issued pursuant to 8 U.S.C. §§ 1226 or 1231(a). *See Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788, 799 (9th Cir. 2020) ("a signed administrative arrest warrant issued pursuant to 8 U.S.C. §§ 1226 or 1231(a)—INA provisions concerning the [Secretary]'s authority to perform arrests by warrant and detain certain aliens—must now accompany a detainer."); *see also City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 187 (5th Cir. 2018) (noting that a detainer request must be accompanied by an administrative warrant and "evidences probable cause of removability in every instance").

Additionally, federal authorities must "make available" to state and local authorities "investigative resources . . . to determine whether individuals arrested by such authorities for aggravated felonies are aliens[.]" 8 U.S.C. § 1226(d)(1)(A). Likewise, federal officials must also "designate and train officers and employees . . . to serve as a liaison to" state and local officials "with respect to the arrest, conviction, and release of any alien charged with an aggravated felony[.]" *Id.* § 1226(d)(1)(B); *see id.* §§ 1226(c), 1231(a).

Congress, further, has authorized the Department of Homeland Security ("DHS") to enter into formal cooperative agreements with states and localities. *See* 8 U.S.C. § 1357(g); *see also*, "ICE's 287(g) Program," https://www.ice.gov/identify-and-arrest/287g (last visited June 12, 2025) ("The 287(g) Program enhances the safety and security of our nation's communities by allowing ICE Enforcement and Removal Operations (ERO) to partner with state and local law enforcement agencies to identify and remove criminal aliens who are amenable to removal from the U.S."). Under these agreements, appropriately trained and qualified state and local law enforcement officers may perform specified functions of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens. 8 U.S.C. § 1357(g)(1). State and local officers' activities under these agreements are "subject to the direction and supervision of the [Secretary of Homeland Security]." 8 U.S.C. § 1357(g)(3). Congress provided that "[n]othing in this subsection shall be construed to require any State or political subdivision of a state to enter into an agreement." 8 U.S.C. § 1357(g)(9). Even in the absence of a written agreement, Congress has established that state and local law enforcement officers may "communicate with the [Secretary] regarding the immigration status of any individual," or "otherwise . . . cooperate with the [Secretary] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10); *see also*

8 U.S.C. § 1324(c) (authorizing state and local law enforcement officers to make arrests for violations of the INA's prohibition against smuggling, transporting, or harboring aliens); 8 U.S.C. § 1252c (affirming state and local officers' authority to arrest certain felons who have unlawfully returned to the United States). Section 1373 further requires federal officials to "respond to an inquiry" by state or local officials "seeking to verify or ascertain the citizenship or immigration status of any individual within the[ir] jurisdiction." *Id*. § 1373(c); 8 U.S.C. § 1644; *see also* 6 U.S.C. § 482(b) (requiring information-sharing among federal agencies).

The Supreme Court has also recognized that information sharing among federal, state, and local governments is essential to the effective enforcement of the immigration laws. *See, e.g., Arizona*, 567 U.S. at 412 (noting Congress "has encouraged the sharing of information about possible immigration violations"). Toward that goal, Congress has prevented states and localities from adopting laws or policies that "prohibit[] or in any way restrict" the ability of state and local law enforcement officers to cooperate with federal officials by sending and receiving "information regarding the citizenship or immigration status, lawful or unlawful, of any individual," or maintaining and exchanging such information. 8 U.S.C. § 1373(a)-(b); *see also* 8 U.S.C. § 1644 (similar). Congress enacted these provisions "to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials" and the former Immigration and Naturalization Service. 3 H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep. to Welfare Reform Act, codified at 8 U.S.C. § 1644). Congress further provided in 8 U.S.C. § 1373 that DHS "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by

providing the requested verification or status information." 8 U.S.C. § 1373(c). Section 1373 "prohibits state and local governments and officials … from directly restricting the voluntary exchange of immigration information' with federal immigration authorities'." *State v. Dep't of Just.*, 951 F.3d 84, 112 (2d Cir. 2020) (quoting *City of New York*, 179 F.3d at 32-33).

## II. CALIFORNIA'S CALIFORNIA VALUES ACT

In 2017, California enacted the California Values Act ("CVA") which, California concedes, "prohibits California state and local law enforcement agencies from assisting federal immigration enforcement efforts," bars them from "investigat[ing], interrogat[ing], detain[ing], detect[ing], or arrest[ing] persons for immigration enforcement purposes," and directs that they may not "[p]rovid[e] information regarding an individual's release date" to federal immigration officials. Defendants' Memorandum in support of motion to dismiss, ECF No. 34-1 at 1, 3.

The CVA works as intended. It prohibits local law enforcement agencies from "[d]etaining an individual on the basis of a hold request." Defendants' Motion to dismiss, ECF. No. 34 at 3. (citing Cal. Gov't Code § 7284.6(a)(1)). As California itself puts it, the CVA prohibits local law enforcement agencies from "[c]ontracting with the federal government for use of law enforcement agency facilities to house federal immigration detainees." *Id.* (quoting Cal. Gov't Code § 7284.6(a)(6)). Moreover, the CVA prohibits local law enforcement agencies from merely "[i]nquiring into an individual's immigration status," or "providing personal information … about an individual, including, but not limited to, the individual's home address or work address," thereby further barring LEAs from providing federal immigration authorities basic information necessary to enforce federal immigration law. Cal. Gov't Code § 7284.6(a)(1)(A), (F).

The State of California and the CVA prohibit Plaintiffs from doing exactly what the immigration laws contemplate: cooperating with the federal government to help enforce federal

law—such as by sharing critical information with federal immigration authorities. California insists these actions are all proscribed by the CVA. But that is no answer, because the CVA is itself unlawful, in violation of the Supremacy Clause of the United States Constitution.

# ARGUMENT

## CALIFORNIA'S CALIFORNIA VALUES ACT VIOLATES THE SUPREMACY CLAUSE

California asserts the CVA is lawful, because it "avoid[s] unnecessary interference in local government." ECF No. 34-1 at 5 (quoting *City of Huntington Beach v. Becerra*, 44 Cal. App. 5th 243, 248 (2020). The CVA, however, does far more than regulate local government. Instead, it actively seeks to frustrate federal enforcement of immigration laws by preventing LEAs from cooperating with federal authorities. That is unlawful, in violation of the Supremacy Clause.

### A.  CVA Unlawfully Regulates the Federal Government.

The CVA unlawfully regulates the federal government by preventing federal agents from using their Congressionally authorized tools to effectuate alien detentions and removals. Stemming from the Supremacy Clause, the doctrine of intergovernmental immunity prevents California from regulating the activities of the Federal government. *See Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal government are free from regulation by any state."); *see also M'Culloch v. State*, 17 U.S. 316 (1819) (4 Wheat.) at 436 (explaining that the states have no power to "in any manner control" the operations of the federal government); *Leslie Miller, Inc. v. State of Arkansas*, 352 U.S. 187, 190 (1956) (explaining that "the immunity of the instruments of the United States . . . extends to a requirement that they desist from performance until they satisfy a state officer" (quoting *Johnson v. State of Maryland*, 254 U.S. 51, 57 (1920));  *Geo Group, Inc. v. Newsom*, 50 F.4th 745, 750 (2022)

("any state regulation that purports to override the federal government's decisions about who will carry out federal functions runs afoul of the Supremacy Clause"). Thus, "even in the absence of a specific federal law, federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993), *aff'd* 54 F.2d 825 (D.C. Cir. 1995), *amended* (July 28, 1995) (citing *Cunningham v. Neagle*, 135 U.S. 1 (1890)).

Under those principles, the provisions of the CVA that California imposes on the City of Huntington Beach improperly regulate the federal government. Specifically, the CVA precludes local law enforcement agencies from honoring ICE detainer requests or from arresting, detaining, or holding individuals in custody "based on civil immigration warrants." Cal. Gov't Code § 7284(a)(1)(E). By refusing to honor civil detainers expressly authorized by Congress and creating a *de facto* requirement that federal immigration authorities obtain a criminal warrant to arrest or take custody of a detained alien, California has unlawfully burdened the use of these means for federal immigrations officials to carry out their statutory functions. California's enforcement of the provisions of the CVA at issue here, therefore, effects direct regulation of the federal government. Congress expressly provided that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Further, through the Laken Riley Act, Congress amended 8 U.S.C. § 1226(c) to provide that the "Secretary of Homeland Security shall issue a detainer for an alien described in paragraph (1)(E)[.]" 8 U.S.C. § 1226(c)(3). And the Supreme Court has acknowledged the role that administrative warrants play in the detention and removal process. *See Arizona v. United*

*States*, 567 U.S. 387, 407–08 (2012) (noting that the Attorney General has discretion to issue warrants, which are executed by federal officers).

Whereas administrative warrants issue on probable cause that the individual is an alien who is subject to removal (which does not necessarily require that the alien committed a criminal offense, *see, e.g.*, 8 U.S.C. §§ 237(a)(1)(C), (D)), criminal judicial warrants issue on probable cause that a crime has been committed, *see Berger v. State of New York*, 388 U.S. 41, 55 (1967). Congress allows federal agents to detain illegal aliens under the former standard, but California, through the provisions of the CVA, prevents federal agents from doing so unless they satisfy the latter, higher standard. These provisions, therefore, foreclose federal immigration officials' use of the congressionally authorized detention method and directly impose a different method, with a different standard, on the federal government for effectuating detentions. California has no such power to prevent federal agents from carrying out their duties "until they satisfy a state officer." *See Leslie Miller, Inc.*, 352 U.S. at 190; *see also Arizona*, 567 U.S. at 406 (recognizing that "a conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy" (alterations and citation omitted)).

California's denial of ICE officials' access to otherwise public state and local facilities likewise regulates federal functions. Specifically, California has conceded in its motion to dismiss—by barring federal immigration authorities from "[a]ssisting immigration authorities in interrogating or arresting an alien," ECF No. 34-1 at 3 (citing Cal. Gov't Code § 7284.6(a)); by barring localities from "[p]roviding information regarding an individual's release date," *id.*; by restricting federal immigration authorities access to aliens in custody without first obtaining the alien's written consent to be interviewed by federal immigration authorities (citing Cal.

Gov't Code § 7283.1); and by barring localities from honoring federal immigration warrants or detainers, *id.*—that California forces federal immigration officers to engage in difficult and dangerous efforts to rearrest aliens who were previously in local custody.

Collectively, these effects of California's CVA necessarily "'require[] ICE to entirely transform its approach to' its sovereign function of transporting and removing noncitizen detainees." *See United States v. King Cnty., Washington*, 122 F.4th 740, 756 (9th Cir. 2024); *see also*, *Geo Group*, 50 F.4th at 758 ("[t]o comply with California law, ICE would have to cease its ongoing immigration detention operations in California and adopt an entirely new approach in the state"). "Because this impermissibly 'override[s] the federal government's decision, pursuant to discretion conferred by Congress,'" the intergovernmental immunity doctrine's regulation prohibition bars the CVA. *See King Cnty.*, 122 F.4th at 756. Indeed, "[t]his foundational limit on state power cannot be squared with the dramatic changes that [CVA] would require ICE to make." *Geo Group*, 50 F.4th at 758.

### B. CVA Unlawfully Discriminates Against the Federal Government.

The doctrine of intergovernmental immunity also prohibits states from discriminating against the Federal government or even just a part of it. *See North Dakota v. United States*, 495 U.S. 423, 434–36 (1990). A state law discriminates against the federal government "by singling out the Federal government for unfavorable treatment." *United States v. Washington*, 596 U.S. 832, 839 (2022). And *any* discriminatory burden on the federal government is impermissible. *See Dawson v. Steager*, 586 U.S. 171, 171 (2019).[2] Although state laws that innocuously "touch[] on an exclusively federal sphere [are] not enough to establish discrimination," *McHenry Cnty. v. Kwame Raoul*, 44 F.4th 581, 594 (7th Cir. 2022), state laws

---

[2] The principles of the intergovernmental tax immunity doctrine apply to the general intergovernmental immunity doctrine. *See North Dakota*, 495 U.S. at 434–39.

that uniquely *burden* federal activities violate this nondiscrimination rule. And courts presume

that such laws are invalid absent clear congressional authorization for that kind of state

regulation. *See Washington*, 596 U.S. at 839; s*ee also King Cnty., Washington*, 122 F.4th at

757 (finding unlawful discrimination where a County Order directed local officials to ensure

that operators who leased space from the County's airport would not service ICE charter

flights).

The provisions of the CVA unlawfully discriminate against the federal government by

singling out federal immigration enforcement for unfavorable treatment. Indeed, the CVA

facially targets federal immigration authorities, denying them access to detainees, state and

local facilities, and information absent a criminal warrant. *See* ECF. No. 34-1 at 3 (prohibiting

local law enforcement agencies from "[d]etaining an individual on the basis of a hold request"

and from "[p]roviding information regarding a person's release date or responding to requests

for notification by providing release dates or other information" (Cal. Gov't Code §

7284.6(a)(1)(B), (C); "[p]rovid[ing] office space exclusively dedicated for immigration

authorities for use within a city or county law enforcement facility" or "responding to requests

for notification by providing release dates or other information" (Cal. Gov't Code §

7284.6(a)(1)(C), (5)); and "[c]ontract[ing] with the federal government for use of California

law enforcement agency facilities to house individuals as federal detainees for purposes of civil

immigration custody" (Cal. Gov't Code § 7284.6(a)(6)). Moreover, California, through the

CVA, prohibits local law enforcement agencies "[a]ssisting immigration authorities in"

boarding and searching for aliens in any car within twenty-five miles of any external border of

the United States. Cal. Gov't Code § 7284.6(a)(1)(D); *see also* 8 U.S.C.A. § 1357. The CVA

contains a blanket prohibition against LEA cooperation with immigration authorities: "[i]n no

case shall cooperation occur pursuant to this section for individuals arrested, detained, or convicted of misdemeanors that were previously felonies, or were previously crimes punishable as either misdemeanors or felonies, prior to passage of the Safe Neighborhoods and Schools Act of 2014 as it amended the Penal Code." Cal. Gov't Code § 7282.5.

These provisions therefore treat federal immigration authorities less favorably than the general public and other law enforcement agencies. Some of the prohibitions California has imposed apply solely against federal ICE officers and not law enforcement officers from other states or localities. *See, e.g.*, Cal. Gov't Code §§ 7283.1, 7283.2, and 7284.10. The CVA, therefore "treats someone else better than it treats [federal immigration authorities]." *North Dakota*, 495 U.S. at 438 (quoting *Washington v. United States*, 460 U.S. 536, 544 (1983)).

California cannot plausibly argue that differential treatment of federal immigration authorities is permissible here because the more favorably treated groups are not "similarly situated" to ICE. *See McHenry Cnty.*, 44 F.4th at 594. Under that argument, because "only" ICE carries out civil immigration enforcement, there could be no entity "similarly situated" to ICE, and, absent such a comparator, California would be free to discriminate with impunity. Singling out functions that only the federal government performs for differential treatment is *ipso facto* evidence of discrimination. Moreover, the provisions of the CVA do not single out an exclusively federal function innocuously—they discriminatorily burden the United States in carrying out that function *specifically* because California disagrees with federal policy.

The Court should not, to evade a finding of discrimination, read the "similarly situated" language so narrowly as to foreclose membership by others. To the contrary, if the only difference justifying the discriminatory treatment is the federal agency's enforcement of a particular federal law, the discrimination is clear. *See King Cnty.*, 122 F.4th at 757–58

(rejecting the County's argument that "significant differences" between ICE and others who chartered flights justified the discriminatory treatment of ICE where the difference was ICE's role in carrying out deportations); *United States v. California*, No. 2:18-CV-721-WBS-DB, 2018 WL 5780003, at *6 (E.D. Cal. Nov. 1, 2018) (rejecting California's argument that it could discourage conveyances of federal public lands because those lands, unlike private lands, are preserved for the public's benefit: "This quality of federal public lands, however, is so directly linked to their federal status that it cannot serve as the basis for non-discriminatory differentiation."); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022) (rejecting California's argument that it could "override the federal government's decision, pursuant to discretion conferred by Congress, to use private contractors to run its immigration detention facilities").

Unlawful discriminatory treatment against a federal agency occurs even where the offending provision avoids explicitly favoring anyone else above the federal government. *Id.* at 761 (even where the statute in question "is a neutral regulation of private conduct" states may not "prohibit[] ICE from exercising its discretion to arrange for immigration detention in the privately run facilities it has deemed appropriate"). Courts that have held otherwise are wrong and their views are incompatible with Ninth Circuit precedent. *See, e.g.*, *McHenry Cnty.*, 44 F.4th at 594 (finding the TRUST Act's prohibition on state and local officials entering into contracts to house immigration detainees in state or local facilities was nondiscriminatory partly because the provision touched on a federal sphere in an innocuous way but did not treat anyone else better than the federal government). Here, the CVA is not a "neutral regulation" because other law enforcement agencies and the public are given access to government

facilities, detainees, and information on more favorable terms than are available to federal immigration authorities. *See, e.g.*, Cal. Gov't Code §§ 7284.6(a)(1)(5), (6).

More fundamentally, the Court should consider the "similarly situated" language in the context of California's discrimination against the federal government. Since *M'Culloch*, 17 U.S. (4 Wheat.) 316 (1819), the Supreme Court has held that states may not impose taxes directly on the federal government. But states may impose nondiscriminatory taxes that indirectly increase costs for the federal government so long as the tax is "imposed equally on the other similarly situated constituents of the State." *United States v. Fresno Cnty.*, 429 U.S. 452, 462 (1977). Underlying this principle is the rationale that taxes imposed solely on federal employees "could be escalated by a State so as to destroy the federal function performed by them[.]" *Id.*, 429 U.S. at 464 n.11. But if the tax were also imposed on residents and voters of the state, that would provide a political check against abuse of the taxing power and abate the danger to the federal government. *Id.*; *cf. Dawson v. Steager*, 586 U.S. 171 (2019) (holding that a state statute exempting from state taxation the pension benefits of state and local law enforcement officers, but not the federal pension benefits of a retired federal marshal, violates intergovernmental immunity).

In contrast, when the target of the impermissible discrimination is the federal government itself, or even just a part of it, the danger is at its peak. *See Washington*, 596 U.S. at 842 (noting the absence of a "ballot-box safeguard" for laws that discriminate solely against the Federal government); *King Cnty., Washington*, 122 F.4th at 757–58 ("[B]urdening federal operations, and *only* federal operations . . . violates the anti-discrimination principle[.]" (citation omitted)). Here too, there is no political check on the unlawful discrimination as long as frustrating the federal government's enforcement of its immigration law remains popular

with voters of the state. Allowing discrimination of this sort to stand undercuts the Supremacy Clause by enabling states to thwart federal policy so long as that policy were implemented by only one federal agency. *See Washington*, 596 U.S. at 841 (explaining that absent the prohibition on discrimination, nothing prevents a state from imposing unduly high costs on the federal government for the benefit of the state's own citizens).

Finally, invalidating the discriminatory provisions of California's CVA would not create a back-end anticommandeering problem. California cannot seriously contend that actively discriminating against the federal government is constitutionally protected inaction. Rather, to the extent California chooses to permit local law enforcement agencies to give other law enforcement agencies and members of the public access to information, detainees in their custody, and facilities, they cannot withhold the same from the federal government just because California disagrees with federal immigration priorities. *See King Cnty., Washington*, 122 F.4th at 758. Just as there is no "threat of unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the county owns its highways," *King Cnty., Washington*, 122 F.4th at 758, there is no such threat when federal immigration authorities access detainees upon their release from state or local custody (including in the public lobbies of state and local facilities) or when federal immigration authorities access information already collected by California or its local law enforcement agencies.

### C. CVA is Conflict Preempted by the Immigration and Nationality Act.

State laws cannot "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Thus, state laws are invalid if they "either frustrate[] the purpose of the national legislation or impair[] the efficiency of th[o]se agencies of the federal government to discharge the duties,

for the performance of which they were created." *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) ("If the purpose of the [federal law] cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield[.]" (citation omitted)).

Pursuant to its "broad, undoubted power over the subject of immigration and the status of aliens," *Arizona v. United States*, 567 U.S. 387, 394 (2012), Congress enacted the INA. The INA established a "comprehensive federal statutory scheme for regulation of immigration and naturalization[.]" *Chamber of Com. of United States v. Whiting*, 563 U.S. 582, 587 (2011). To effectuate that scheme, the INA defines categories of aliens who may not be admitted to the United States; makes unlawful entry and reentry federal offenses; specifies which aliens may be removed from the United States and the procedures for such removal; and vests federal immigration officials with significant discretion, among other things. *See Arizona*, 567 U.S. at 396; *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress . . ."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government"); *see also Hines*, 312 U.S. at 68 ("[T]he power to restrict, limit, regulate, and register aliens as a distinct group is not an equal and continuously existing concurrent power of state and nation, but that whatever power a state may have is subordinate to supreme national law.").

Because Congress found that "deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers," *Nielsen v. Preap*, 586 U.S. 392, 398 (2019) (citation omitted), Congress requires federal immigration

agents to detain criminal illegal aliens immediately upon their release from state or local custody, pending their removal from the United States. *See, e.g.*, 8 U.S.C. §§ 1226(a), (c), 1231(a). The provisions of the CVA "frustrate[] the purpose" of the INA and "impair[] the efficiency" of federal immigration authorities "to discharge the duties, for the performance of which they were created." *See Davis*, 161 U.S. at 283. Its provisions prohibit local law enforcement agencies from "[d]etaining an individual on the basis of a hold request;" "[m]aking or intentionally participating in arrests based on civil immigration warrants;" and from "[c]ontracting with the federal government for use of law enforcement agency facilities to house federal immigration detainees." ECF. No. 34-1 ¶4.28 (quoting Cal. Gov't Code. § 7284.6(a)(1)(B), (E), (6)). But Congress expressly authorized the very cooperation the CVA prohibits, including detention on the basis of hold requests, arrests based on civil immigration warrants, and cooperation in the form of contracts between federal and local authorities to facilitate the same. *See* 8 U.S.C. §§ 1226, 1357. Accordingly, the INA conflict preempts the relevant provisions of the CVA.

### D.  8 U.S.C. § 1373 Expressly Preempts CVA's Restrictions on Information Sharing.

Independent of conflict preemption, 8 U.S.C. § 1373(a) expressly preempts CVA's restrictions on information sharing. Express preemption occurs when Congress explicitly precludes state or local regulation in a particular area. *See, e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (finding express preemption where the federal law provided that "[N]o State . . . shall enact or enforce any law . . . relating to rates, routes, or services of any air carrier" (49 U.S.C. App. § 1305(a)(1) (1988 ed.)).

Section 1373(a)'s preemptive language provides that a "[s]tate . . . or local government entity or official may not prohibit, or in any way restrict, any government entity or official

from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). That provision makes clear Congress's intent that states not stand in the way of the federal government's regulation of aliens, thereby codifying the constitutional principles outlined above. *See also Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 478 (2018) (explaining that "it is a mistake to be confused by the way in which a preemption provision is phrased," because "language might appear to operate directly on the States" but in substance merely prevent the states from obstructing federal regulation of private parties); *see id.* (discussing 49 U.S.C. app. § 1305(a)(1) (1988)).

This type of information-sharing law does not implicate the Tenth Amendment's anticommandeering principle. In *Printz*, although the Court held that local law enforcement officers could not be required to perform background checks to validate the legality of gun sales under federal law, it distinguished statutes that "require only the provision of information to the Federal government," as they "do not involve . . . the forced participation of the States' executive in the actual administration of a federal program." *Printz v. United States*, 521 U.S. 898, 918 (1997). The Supreme Court's Tenth Amendment cases are therefore not properly read to invalidate reporting requirements, such as the requirement for "state and local law enforcement agencies to report cases of missing children to the Department of Justice." *Id.* at 936 (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a), transferred to 34 U.S.C. § 41307); *see Reno v. Condon*, 528 U.S. 141, 151 (2000) (Constitution does not prohibit federal enactments that "do[] not require the States in their sovereign capacity to regulate their own citizens," but instead "regulate[ ] the States as the owners of data bases"). Invalidating the

unconstitutional restrictions on information sharing, thereby giving state officers the choice to communicate with federal agents, would therefore not violate the Tenth Amendment.

Moreover, unlike in *Murphy*, 584 U.S. at 458, where the federal statutory provision at issue did not "impose any federal restrictions on private actors," but instead sought to prohibit states from authorizing sports gambling schemes, *id.* at 480, here, the federal government and California both seek to regulate private individuals. The issue is therefore not whether the federal government has commandeered a state, but whether the state's scheme is preempted insofar as it poses an obstacle to the effectuation of the federal scheme. And it is precisely when two regulatory schemes collide in this fashion that the Supremacy Clause prohibits the State from using its authority to create an obstacle to the functioning of the federal scheme. *See Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 289–90 (1981) (stating that it "is incorrect" to "assume that the Tenth Amendment limits congressional power to preempt or displace state regulation of private activities . . .").

Indeed, given its exclusive authority over immigration, Congress could have provided that it would immediately remove aliens regardless of pending state criminal prosecutions. Instead, Congress allows states to enforce their criminal laws against aliens before deportation. But if states choose to do so, they cannot, for example, terminate custody or refuse to communicate or cooperate in a way that frustrates the federal government in assuming custody for the purpose of removing the alien. Allowing state criminal custody to continue while requiring that states take the steps necessary to effect an orderly transfer to federal officers at the end of such custody does not in any sense "commandeer" the state into enforcing federal law, but, rather, merely places conditions on the state's exercise of its own regulatory authority. *See Hodel*, 452 U.S. at 290–91 ("We fail to see why the Surface Mining Act should

become constitutionally suspect simply because Congress chose to allow the States a regulatory role."). So long as Congress has expressly or implicitly preempted a state from interfering with federal regulation of private parties, it is not impermissibly regulating the state directly.

Unlike the "commandeering" cases where the Supreme Court was concerned about political accountability, the federal government here is not requiring California and its localities to enforce federal law; it does not expect them to arrest particular aliens or extend the custody of those who would otherwise be released. *See Printz*, 521 U.S. at 926 (citing *New York v. United States*, 505 U.S. 144, 188 (1992)); *see also Murphy*, 584 U.S. at 473. Instead, it is the federal government that seeks to assume custody, and only of those aliens that California and its localities have already decided, for their own reasons, to take into custody pursuant to state and local criminal law. When ICE shows up at a California or local facility to take an alien into federal custody, there is no question of whom to blame. The federal government bears sole responsibility for the actions it takes with respect to private individuals pursuant to its regulatory authority. *Cf.* 8 U.S.C. § 1226(f) (allowing states to sue the federal government for decisions or failures with respect to the detention of aliens that cause harm to a state or its residents).

Ultimately, the Court must understand the Tenth Amendment in the context of the Constitution as a whole. Limits on the sovereign powers of the states "are an essential part of the Framers' conception of national identity and Union." *California v. Superior Ct. of California, San Bernardino Cnty.*, 482 U.S. 400, 405 (1987). Writing on the Extradition Clause, for instance, the Supreme Court noted its "obvious objective" "that no State should become a safe haven for the fugitives from a sister State's criminal justice system." *Id.* at 406.

That Clause provides that one state may demand that another state return fugitives to its custody. *See* U.S. Const. art. IV, § 2; *see also Kentucky v. Dennison*, 65 U.S. 66, 100 (1860) ("[I]t is manifest that the statesmen who framed the Constitution were fully sensible, that from the complex character of the Government, it must fail unless the States mutually supported each other and the General Government[.]"). If one state could demand that another state release a criminal into its custody without offending the Constitution, it follows that the United States can do the same.

So long as Section 1373 is constitutional—as it is—there is no doubt the CVA violates it. The statutory text, structure, and purpose of Section 1373 confirm that "information regarding citizenship or immigration status" also covers aliens' contact information and release dates. By its terms, Section 1373(a) applies to any "information *regarding* [an individual's] citizenship or immigration status[.]" 8 U.S.C. § 1373(a) (emphasis added). As the Supreme Court has explained, statutory terms like "regarding" or "related to" have "a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717–18 (2018) (citing authorities); *see also United States v. California*, 314 F. Supp. 3d 1077, 1104 (E.D. Cal. 2018) (determining that the phrase "information regarding" should be read to "serve[] a purpose even when the statute is read narrowly."), *aff'd in part, rev'd in part and remanded*, 921 F.3d 865 (9th Cir. 2019). The Ninth Circuit eschewed this commonsense approach instead opting to read the phrase "information regarding" out of the statute entirely. *United States v. California*, 921 F.3d 865, 892 (9th Cir. 2019). That reading of Section 1373(a) is misguided for at least four reasons.

*First*, as the Supreme Court has held, reading the term "regarding" to have such a "broadening effect," *Lamar, Archer & Cofrin, LLP*, 584 U.S. at 717, is especially appropriate in this statutory context, because 8 U.S.C. § 1373(c), which establishes federal officials' duty to share information with states, does not include the term in requiring federal officials to provide "the citizenship or immigration status of any individual" to states. Congress' inclusion of "regarding" in Section 1373(a), juxtaposed with its omission of such a term in an otherwise-parallel provision of the same statute, indicates that "Congress intended a difference in meaning." *Loughrin* v. *United States*, 573 U.S. 351, 358 (2014).

*Second*, while the applicable context of "regarding" is important, "[p]roper interpretation [of language in a statute] considers not only the specific context in which the language is used, but the overall structure of the statute as a whole, as well as its history and purpose." *City of Chicago v. Barr*, 961 F.3d 882, 898–99 (7th Cir. 2020). The legislative history of Section 1373 provides additional insight into the meaning of "regarding" here. *See Arizona*, 567 U.S. at 405 (considering legislative history as part of a conflict-preemption analysis). Congress enacted Section 1373 to ensure that state and local officials can "communicate with [federal immigration authorities] regarding *the presence, whereabouts, or activities of illegal aliens*," not merely their legal classification. H.R. Rep. No. 104-725, at 383 (1996) (emphasis added); *see also* S. Rep. No. 104-249, at 19–20 (1996) ("The acquisition, maintenance, and exchange of immigration-related information by State and local agencies is . . . of considerable assistance to . . . achieving of the purposes and objectives of the [INA].").

*Third*, the detention and removal provisions of the INA establish a clear relationship between an alien's release date and immigration status. 8 U.S.C. § 1231(a)(4)(A) (providing that a convicted alien in state criminal custody who is subject to a final removal order may not

be removed until "released from imprisonment"). The release date thus dictates when such an alien must be detained and removed from the United States—a matter directly related to (and thus "regarding") the alien's "immigration status." Accordingly, Section 1373(a) expressly preempts the Sanctuary Policies' restrictions on sharing information about a detainee's upcoming release from custody.

*Fourth*, contact information, including current addresses, also directly bears on an alien's immigration status. Aliens must "notify the [Secretary of Homeland Security] in writing of each change of address and new address within ten days from the date of such change[.]" 8 U.S.C. § 1305. Failure to comply with that provision is itself grounds for mandatory detention and removal, unless excused. *See* 8 U.S.C. § 1306. An alien's current address reveals whether the alien has complied with the notification requirement, which in turn dictates whether the alien is subject to detention and removal. Contact information, like release-date information, is therefore also directly related to the alien's immigration status.

Against that backdrop, California's restrictions on information sharing are expressly preempted by Section 1373. The CVA states that local law enforcement agents are not permitted to "[p]rovid[e] information regarding an individual's release date" or "[p]rovid[e] an individual's home address or other personal information" to immigration authorities. ECF No. 34-1 at 3 (citing Cal. Gov't Code § 7284.6(a)(1)). Nor can California point to its purported savings clause to avert the conflict. *See* Cal. Gov't Code § 7284.6(e) (noting that the CVA permits local law enforcement agents to undertake those activities "pursuant to Sections 1373 and 1644 of Title 8 of the United States Code"). Section 1373 does not require states and local governments to share and maintain that information, however, but only prohibits restrictions on those activities. California has therefore prohibited the sharing of information that federal law

expressly contemplates states will share, and so the relevant provisions of the CVA are
expressly preempted.

## CONCLUSION

The Supremacy Clause prohibits California from obstructing the federal government's
ability to enforce laws that Congress has enacted. Neither is California permitted to take
actions entrusted to the federal government by the United States Constitution. California may
not, without running afoul of the Supremacy Clause, enact legislation that places its local law
enforcement officers in the position of obstacles to the execution of federal immigration laws.
Moreover, California's CVA impermissibly regulates and discriminates against the federal
government. Finally, Congress has expressly preempted the provisions of the CVA that
California imposes on the City of Huntington Beach, its City Council, Police Department,
Police Chief, and Sheriff.

Accordingly, the provisions of the CVA that California enforces against the City of
Huntington Beach are themselves unlawful—void ab initio under the Supremacy Clause. This
Court should ultimately find for the Plaintiffs.


Dated:  June 17, 2025                          Respectfully Submitted,

BRETT A. SHUMATE                       /s/ *Sean Skedzielewski*
Assistant Attorney General             Sean Skedzielewski
Civil Division                         Counsel to the Assistant Attorney General
                                       United States Department of Justice
DREW C ENSIGN                          Civil Division
Deputy Assistant Attorney General      950 Pennsylvania Ave NW, Ofc 3631
                                       Washington, DC 20530
ANTHONY P. NICASTRO                    Phone: 202.307.1697
Acting Director                        Email: Sean.Skedzielewski@usdoj.gov
General Litigation & Appeals Section
                                       *Attorneys for the United States*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee of the United States Department of Justice and is a person of such age and discretion as to be competent to serve papers.

That on June 17, 2025, he electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the attorney(s) of the Parties:

Maria Buxton
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

Gabrielle D Boutin
CAAG - Office of the Attorney General
California Department of Justice
1300 I Street
PO Box 944255
Sacramento, CA 94244

Ernest Israel Herrera
Mexican American Legal Defense and Educational Fund
Los Angeles Regional Office
634 S Spring St
Ste 11th Floor
Los Angeles, CA 90014

Eduardo Casas
Mexican American Legal Defense and Educational Fund
634 South Spring Street 11th Floor
Los Angeles, CA 90014

Michael J Vigliotta
City of Huntington Beach
2000 Main Street
P.O. Box 190
Huntington Beach, CA 92648

James K Rogers
America First Legal Foundation
611 Pennsylvania Ave., SE #231
Washington, DC 20003

/s/ Sean Skedzielewski
Sean Skedzielewski
Counsel to the Assistant Attorney General
United States Department of Justice
Civil Division
950 Pennsylvania Ave NW, Ofc 3631
Washington, DC 20530
Phone: 202.307.1697
Email: Sean.Skedzielewski@usdoj.gov