JS-6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—
GENERAL

| Case No. | 8:25-cv-00026-SSS-SPx | Date | December 1, 2025 |
|---|---|---|---|
| Title | City of Huntington Beach et al. v. State of California et al. | | |

Present: The Honorable    SUNSHINE S. SYKES, UNITED STATES DISTRICT JUDGE

| Irene Vazquez | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:   (IN CHAMBERS) ORDER GRANTING DEFENDANTS' MOTION TO DISMISS [DKT. NO. 34]**

Before the Court is Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint ("SAC"). Having considered the parties' arguments, relevant legal authority, and record in this case, the Court **GRANTS** Defendants' Motion to Dismiss. [Dkt. No. 34, "Motion"].

I.   **BACKGROUND**

In 2017, California enacted Senate Bill 54 ("SB 54"), also known as the California Values Act. The California Legislature stated in SB 54 that a "relationship of trust between California's immigrant community and local agencies is central to the public safety of the people of California," that "[t]his trust is threatened when state and local agencies are entangled with federal immigration enforcement," and that "[e]ntangling state and local agencies with federal immigration enforcement programs diverts already limited resources and blurs the lines of accountability between local, state, and federal governments." Cal. Gov't Code § 7284.2(a)–(c). To "ensure effective policing" and protect public health and safety, SB 54 generally prohibits California state and local law enforcement agencies from assisting federal immigration enforcement efforts. *See id.*

§§ 7284.2(g), 7284.6.  The Legislature further found that state involvement in federal immigration enforcement threatens the "relationship of trust between California's immigrant community and state and local agencies," causing immigrant community members to "fear approaching police when they are victims or witnesses to crimes . . . to the detriment of public safety and the well-being of all Californians."  § 7284.2(b), (c).

Specifically, SB 54 prohibits California law enforcement agencies from (1) inquiring into an individual's immigration status; (2) detaining an individual on the basis of a hold request; (3) providing information regarding an individual's release date; (4) providing an individual's home address or other personal information; (5) making or intentionally participating in arrests based on civil immigration warrants; (6) assisting immigration authorities in interrogating or arresting a noncitizen[1], or other activities described in 8 U.S.C. § 1357(a)(3); (7) performing the functions of an immigration officer or placing peace officers under the supervision of federal agencies; (8) using immigration authorities as interpreters for law enforcement matters relating to individuals in agency or department custody; (9) transferring an individual to immigration authorities without a judicial

---

[1] This Order uses the term "noncitizen" in place of "alien."  The Court follows the U.S. Supreme Court and Ninth Circuit, where the use of the term "noncitizen" has become a common practice.  *See Patel v. Garland*, 596 U.S. 328 (2022) (Barrett, J.); *United States v. Palomar-Santiago*, 593 U.S. 321 (2021) (Sotomayor, J.); *Barton v. Barr*, 590 U.S. 222, 226 n.2, (2020) (Kavanaugh, J.) ("This opinion uses the term 'noncitizen' as equivalent to the statutory term 'alien.'" (citing 8 U.S.C. § 1101(a)(3))); *Avilez v. Garland*, 69 F.4th 525 (9th Cir. 2023); *Arce v. United States*, 899 F.3d 796 (9th Cir. 2018).  Additionally, this Court thinks it is prudent to "avoid language that reasonable readers might find offensive or distracting—unless the biased language is central to the meaning of the writing." *Chicago Manual of Style Online* 5.253, https://www.chicagomanualofstyle.org/book/ed17/part2/ch05/psec253.html.  As noted by the Ninth Circuit, "[t]he word alien can suggest 'strange,' 'different,' 'repugnant,' 'hostile,' and 'opposed[.]'" *Avilez*, 69 F.4th at 527 n.1 (citing *Alien*, *Webster's Third New International Dictionary* 53 (2002)).  Accordingly, because the word "noncitizen" is synonymous and does not encompass such negative connotations, the Court finds "noncitizen" is a better word choice.  *See Alien* and *Noncitizen*, *American Heritage Dictionary of English Language* 44, 1198 (5th ed. 2011).

warrant or judicial probable cause determination for an immigration violation; (10) contracting with the federal government for use of law enforcement agency facilities to house federal immigration detainees; and (11) providing office space for use by immigration authorities. Cal. Gov't Code § 7284.6(a).

This prohibition is not without notable exceptions. *See* Cal. Gov't Code §§ 7282.5, 7284.6(b), (e). For example, when an individual has been convicted of certain serious crimes, including specified serious and violent felonies, SB 54 permits local law enforcement to transfer the individual to federal immigration authorities or provide immigration officials with release date information. *Id.* §§ 7282.6(a)(1)(C), 7284.6(a)(4), 7282.5(a). Moreover, where SB 54 does not expressly prohibit it, law enforcement officials have discretion to cooperate with immigration authorities—or not—provided that doing so would not violate any other local, state, or federal laws. *Id.* § 7282.5(a). SB 54 also expressly states that it does not prohibit any government entity or official from communicating to federal immigration authorities the citizenship or immigration status of individuals "pursuant to Sections 1373 and 1644 of Title 8 of the United States Code." *Id.* § 7284.6(e).

The federal government has already unsuccessfully challenged the constitutionality of SB 54 under the Supremacy Clause, and Plaintiff City of Huntington Beach has also unsuccessfully challenged SB 54 under the California Constitution. *United States v. California*, 921 F.3d 865, 890–91 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 124 (2020) (holding on the merits that SB 54 is not preempted because it does not conflict with any federal obligation imposed on state or local governments and does not constitute an obstacle to federal enforcement; further explaining that compelling state assistance would violate Tenth Amendment's anti-commandeering doctrine); *City of Huntington Beach v. Becerra*, 44 Cal.App.5th 243, 248 (2020) (holding on the merits that SB 54 is valid under the California Constitution as applied to charter cities because it addresses statewide concerns—such as public safety, policing, and constitutional rights—and is reasonably related and narrowly tailored to those concerns).

Plaintiffs are the City of Huntington Beach, its city council, its police department, and the police chief in his official capacity. [SAC ¶ 1–4]. The City of Huntington Beach is a municipal corporation formed as a charter city under Article XI, sections 3 and 5 of the California Constitution. [*Id.* ¶ 6]. The Riverside County Sheriff, Coroner, and Public Administrator Chad Bianco is also a Plaintiff in his official capacity. [*Id.* ¶ 5]. Defendants are the State of California, California

Governor Gavin Newsom, and California Attorney General Rob Bonta, in their official capacities.  [*Id.* ¶ 6–8].

Plaintiffs allege that SB 54 "directly conflicts with U.S. Federal immigration, criminal, and civil rights laws" because it limits the ability of city officials to engage fully in effective law enforcement practices and directs city officials to violate U.S. federal law.  [*Id.* at 5].  Plaintiffs refer to this conflict of law as an untenable "Catch-22" in which the city officials either must comply with SB 54 and violate U.S. federal immigration law, or vice versa.  [*Id.*].  Plaintiffs also allege that SB 54 forces city officials to violate California law for "aiding and abetting" and "accessory after the fact" in harboring, concealing, or protecting a perpetrator who committed a federal crime.  [*Id.* at 7].  At the heart of Plaintiffs' argument is that the City of Huntington Beach should be able to voluntarily cooperate with the federal government in its operations to "combat local crime and promote local public safety" and that SB 54 must yield to U.S. Federal immigration laws under the Supremacy Clause of the U.S. Constitution.  [*Id.* at 8].  Plaintiffs seek declaratory relief invalidating, and injunctive relief enjoining, California's enforcement of operative portions of California's "Sanctuary State Law," which includes, among others, California Government Code §§ 7282, 7282.5, 7283-7283.2, 7284-7284.12, and 7285-7285.3.  [*Id.*].

Defendants filed a Motion to Dismiss, mounting a facial attack on the SAC on the grounds that Plaintiffs lack standing to bring their claim.  [*See generally* Motion].  Along with arguments contesting Plaintiffs' Article III standing, Defendants also raise issues of sovereign immunity that bar suit.  [*Id.*]

## II.   LEGAL STANDARD

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  A facial attack is based on the challenger's assertion that allegations in the complaint are "insufficient on their face to invoke federal jurisdiction."  *Id.*  A factual attack disputes the validity of allegations that, if true, would invoke federal jurisdiction. *Id.*  In resolving a factual attack, the Court "need not presume the truthfulness of the plaintiffs' allegations."  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

Once a defendant moves to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of establishing the court's subject matter jurisdiction.

*See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).

"[L]ack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). To have Article III standing, Plaintiffs must show: (1) an "injury in fact," (2) "causation," and (3) "a likelihood that a favorable decision will redress the plaintiff's alleged injury." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

### III. DISCUSSION

#### A. Plaintiffs' Standing for Claims 1 Through 5 and 8 Through 10

Plaintiffs allege the following violations of federal law: (1) the Supremacy Clause of the U.S. Constitution (Claim 1); (2) the Naturalization Clause of the U.S. Constitution (Claim 2); (3) federal immigration and criminal statutes (Claims 3 through 5); (4) the First Amendment of the U.S. Constitution (Claim 8); (5) civil rights under 42 U.S.C. § 1983 (Claim 9); and (6) "non-statutory cause of action for violation of federal law" under *Ex Parte Young* (Claim 10). For the following reasons, the Court **GRANTS** Defendants' Motion to Dismiss the aforementioned claims for lack of standing.

##### 1. Article III Standing for City Plaintiffs

Plaintiffs Huntington Beach, Huntington Beach City Council, and Huntington Beach Police Department (collectively, the "City Plaintiffs") lack Article III standing to bring these federal claims against the State of California and its officials under the *South Lake Tahoe* standing rule.

The Ninth Circuit has consistently held that political subdivisions—such as a city, airport authority, health district, or school district—lack standing to challenge

state law on constitutional grounds in federal court.² *City of S. Lake Tahoe v. California Tahoe Reg'l Plan. Agency*, 625 F.2d 231, 233–34 (9th Cir. 1980); *City of San Juan Capistrano v. California Pub. Utilities Comm'n*, 937 F.3d 1278, 1280 (9th Cir. 2019). This is a "per se" rule to which the Ninth Circuit "has not recognized any exception." *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998).

*South Lake Tahoe*, and the subsequent Ninth Circuit decisions applying it, control as law of the circuit. *See Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001) ("Once a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court."); *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1362–64 (9th Cir. 1998); *Palomar Pomerado Health Sys. v. Belshe*, 180 F.3d 1104, 1106–09 (9th Cir. 1999); *Okanogan Sch. Dist. #105 v. Superintendent of Pub. Instruction for Wash.*, 291 F.3d 1161, 1165–66 (9th Cir. 2002).

California charter cities are treated the same as other political subdivisions for purposes of Article III standing. *Burbank-Glendale-Pasadena Airport Auth.*, 136 F.3d at 1364; *see City of Huntington Beach v. Newsom*, No. 8:24-CV-02017, 2025 WL 1720210, at *3 (C.D. Cal. June. 16, 2025) (again defining charter cities

---

² Plaintiffs cite to a portion of *South Lake Tahoe* where the Ninth Circuit discusses *Board of Education of Central School District No. 1 v. Allen*, 392 U.S. 236 (1968), to assert that local officials and municipalities have standing where they face negative consequences whether they enforce the state law or not. [Dkt. No. 41, "Opp." at 3–4 (quoting *South Lake Tahoe*, 625 F.2d at 236–38)]. However, Plaintiffs need not read much further past the portion of *South Lake Tahoe* that they cite to support this assertion before finding that the Ninth Circuit has expressly held that *Allen* is not binding Supreme Court precedent on this issue. *Id.* at 236–37 ("The sum of recent Supreme Court teachings indicates that the *Allen* theory of standing, which was itself an abrupt departure from settled precedent, must be carefully considered . . . We begin our analysis by considering whether *Allen* can properly be considered as binding Supreme Court precedent. We conclude it cannot and therefore that the councilmembers' desire not to violate their oaths of office does not confer standing."). The Ninth Circuit determined that after *Allen*, the Supreme Court had "significantly tightened standing requirements." *Id.* at 236.

as political subdivisions that are subordinate political bodies, not sovereign entities, for purposes of standing).

### i. Claims 1, 2, and 8

Claims 1, 2, and 8 respectively allege violations of the Supremacy Clause, Naturalization Clause, and the First Amendment of the U.S. Constitution. As these claims challenge the constitutionality of a state statute on its face, this is a straightforward application of *South Lake Tahoe*. [*See* SAC at ¶¶ 145–50, 161–68, 247–53]. Thus, the City Plaintiffs, as a political subdivision of the State of California, lack standing in federal court for such claims that allege violations of the U.S. Constitution.

### ii. Claims 3 Through 5

Plaintiffs also lack standing under *South Lake Tahoe* to bring Claims 3 through 5, which allege that SB 54 violates or causes Plaintiffs and their personnel to violate federal immigration and criminal statutes: 8 U.S.C §§ 1324, 1373, 1644 and 18 U.S.C. §§ 4, 371, 372, 1512.

Ninth Circuit precedent demonstrates how the *South Lake Tahoe* bar on standing extends beyond direct, facial constitutional challenges to a state statute and onto claims that allege a conflict between state and federal law, implicating the Supremacy Clause. *See Okanogan*, 291 F.3d at 1165–66 (holding that the conflict between a state's withholding of federal funds provided by a federal statute was no exception to the *South Lake Tahoe* rule); *Palomar*, 180 F.3d at 1107 (rejecting under *South Lake Tahoe* on standing grounds a health district's attempt to invoke the Supremacy Clause to enjoin enforcement of state reimbursement regulation that conflicted with federal Medicaid law); *Burbank*, 136 F.3d at 1363–64 (rejecting an exception to the per se *South Lake Tahoe* rule where the state statute is allegedly interfering with strong federal interests).

Plaintiffs argue that these cases do not apply because their claims are not brought under the Supremacy Clause, but through a "substantive statutory right conferred explicitly on political subdivisions by Congress." [Dkt. No. 41, "Opp." at 3–4]. Specifically, Plaintiffs cite to the language of 8 U.S.C. §§ 1373 and 1644 to assert this conferral of standing. [*Id.* at 4]. However, as Defendants point out, the line of Ninth Circuit cases that have applied the *South Lake Tahoe* standing bar, including *Okanogan* and *Palomar*, all involve claims based on federal statutes that arguably confer substantive rights on the plaintiffs. Regardless, Plaintiffs conflate

the standing requirements of Article III with rights that Congress may confer onto the subjects of federal statutes. "It is settled that Congress cannot erase Article III standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation modified) ("Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."). That 8 U.S.C. §§ 1373 and 1644 give local government entities certain rights, such as the ability to exchange information with federal agents, does not in itself allow Plaintiffs to circumvent settled Ninth Circuit precedent that political subdivisions lack Article III standing to challenge state law on constitutional grounds in federal court.

Plaintiffs' argument that a violation of a procedural right granted by statute is adequate for standing fares no better, primarily because Plaintiffs never explicate the specific procedural right or injury that is distinct from the substantive rights they are alleging. Nor do Plaintiffs explain how the deprivation of that procedural right is connected to a concrete interest to satisfy standing requirements. *See Spokeo*, 578 U.S. at 341 ("[Plaintiff] could not . . . allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III."); *see also Lujan*, 504 U.S. at 572–73 (explaining the possibility of finding Article III standing where plaintiffs seek enforcement of procedural requirements to protect a concrete interest).

As such, the City Plaintiffs, a political subdivision of the State of California, lack Article III standing in federal court for Claims 3 through 5.

### iii. Claim 9

The City Plaintiffs lack standing for Claim 9, which alleges a § 1983 violation for depriving Plaintiffs of their First Amendment rights and rights under the previously discussed federal immigration and criminal statutes.

The Ninth Circuit has already applied the *South Lake Tahoe* standing bar to § 1983 claims. *See Okanogan Sch. Dist. #105*, 291 F.3d at 1162–63 (applying *South Lake Tahoe* standing bar to a § 1983 cause of action, which alleged that a Washington state law violated a federal law, offsetting federal forest reserve funds against the state's basic education allocation and thereby depriving local schools of the full benefit Congress intended).

Here, the Court agrees with Defendants that this claim merely utilizes § 1983 as an alternative vehicle for alleging that SB 54 violates the U.S. Constitution and federal law. As such, the City Plaintiffs, as a political subdivision of the State of California, lack standing in federal court for this claim alleging civil rights violation under § 1983.

### iv. Claim 10

The City Plaintiffs also lack standing for Claim 10, which alleges a "non-statutory cause of action for violation of federal law" under *Ex parte Young*. 209 U.S. 123 (1908). [SAC at ¶ 263–67].

Contrary to the City Plaintiffs' arguments, "*Ex parte Young* does not provide [a plaintiff] with standing to sue in federal court." *Palomar*, 180 F.3d at 1108. Instead, "*Young* only provides a narrow exception to Eleventh Amendment immunity for certain suits seeking declaratory and injunctive relief against unconstitutional actions taken by state officers in their official capacities." *Id.* (citation modified).

The Court concludes Plaintiffs' arguments regarding *Ex parte Young*'s applicability to this action does not address the standing and jurisdictional issues identified above and below. Additionally, "the general rule is that relief sought nominally against [a state] officer is in fact against the sovereign if the decree would operate against the latter." *Id.* (citation modified).

As such, the City Plaintiffs, as a political subdivision of the State of California, lack standing in federal court under *Ex parte Young*. Thus, Claims 1 through 5 and 8 through 10 as to the City Plaintiffs are **DISMISSED WITHOUT PREJUDICE**.

### 2. Article III Standing for Law Enforcement Officials

Just as *South Lake Tahoe* prevents cities and other political subdivisions of the state from challenging the constitutionality of state laws in federal court, public officials like the Chief of the Huntington Beach Police Department and Riverside County Chief Sheriff Chad Bianco (collectively, "Law Enforcement Officials") also lack standing to do so. When a public official's interests and alleged injury in a case is "official," rather than "personal," the official in their official capacity lacks standing to challenge the constitutionality of the state law in federal court. *Thomas v. Mundell*, 572 F.3d 756 (2009); *South Lake Tahoe*, 625 F.2d at 237

(explaining how, if the councilmembers-plaintiffs had brought their claims to represent the City's interests, their claims would be barred along with the City's).

### i. Alleged Injuries in Official Capacity

Here, the Law Enforcement Officials allege that SB 54 and the supposed increased number of "illegal [noncitizens]" result in injuries to their following proprietary interests: (1) decreased revenue caused by undocumented immigrant residents and workers who do not pay taxes; (2) lower tax revenue from decreased property values; (3) increased expenditures for criminal enforcement, enforcement of labor and health laws and regulations, traffic and parking enforcement, public services, operating jail facilities; (4) and a limitation on the Law Enforcement Officers' abilities to regulate their jurisdictions, including conducting law enforcement activities in conformity with the requirements of federal law. [SAC at ¶¶ 129–40]. Such interests are plainly those of the City of Huntington Beach and Riverside County, not of the Law Enforcement Officials. Thus, the Law Enforcement Officials lack standing to allege such injuries.

Similarly, any limitation on the Law Enforcement Officials' ability to conduct law enforcement activities in conformity with federal law is also not a "loss of a private right" that allows them to circumvent the "clear import of *South Lake Tahoe*"—it is instead a loss, if any, of their institutional power that runs with their offices. *Thomas*, 572 F.3d at 762 (applying the *South Lake Tahoe* standing bar because the County Attorney's alleged "disadvantage[] . . . in fulfilling prosecutorial functions" was "institutional, not personal").

### ii. Alleged Personal Injuries: Threat of Criminal Prosecution

Law Enforcement Officials further argue that they specifically and plausibly alleged a personal injury to satisfy standing requirements. According to the Law Enforcement Officials, the SAC demonstrates that they face a credible threat of criminal prosecution and imprisonment. [Opp. at 13–14]. Law Enforcement Officials also narrow the scope of *South Lake Tahoe*, arguing that the risk of *civil* liability, not criminal, was the determinative factor in the Ninth Circuit's holding that such risk was "too attenuated and conjectural to supply the [officials] with a basis for standing. [*Id.*].

However, the Ninth Circuit expressly warned against conferring standing on public officials in this scenario even if their decision not to enforce a statute may

result in *criminal* liability, stating that doing so "would convert all officials charged with executing statutes into potential litigants, or attorneys general, as to laws within their charge."³ *South Lake Tahoe*, 625, F.2d at 238.

Here, putting aside the fact that the Law Enforcement Officials did not bring their claims in their individual capacities in this action to allege their own personal injuries—or that the Ninth Circuit has already held that even a threat of criminal liability may not amount to standing for public officials—the Court finds that the Plaintiffs' alleged risk of criminal prosecution is not credible for purposes of standing.

"A plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (citation modified). "[G]eneralized threats of prosecution do not confer constitutional ripeness." *Unified Data Servs., LLC v. Fed. Trade Comm'n*, 39 F.4th 1200, 1210 (9th Cir. 2022). "Rather, there must be 'a genuine threat of *imminent* prosecution." *Id.* (emphasis added). In assessing a "credible threat of prosecution," courts consider "[1] whether the plaintiffs have articulated a concrete plan to violate the law in question, [2] whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and [3] the history of past prosecution or enforcement under the challenged statute." *Id.*

Although a specific threat of prosecution to an individual plaintiff is not always necessary to establish a credible threat of enforcement, in such cases, "a combination of other circumstances" must still exist that together "amount[] to a credible threat of enforcement." *Isaacson v. Mayes*, 84 F.4th 1089, 1100 (9th Cir. 2023).

Here, Law Enforcement Officials have not shown that there exists a specific warning or threat to initiate proceedings against them. Law Enforcement Officials refer to Defendant Governor Gavin Newsom's "series of substantial steps [taken] to incentivize the inflow of illegal immigration into California" as a means of

---

³ Plaintiffs' argument that this portion of the opinion was dicta is unsupported and unpersuasive—the cited paragraph immediately precedes the holding on this specific issue and functions to explain why contours of "official" interests are distinct from "personal" ones.

showing his "intent to enforce the Sanctuary State Laws . . . ." [SAC at ¶ 169, 174]. Yet none of the listed actions amount to specific warning or threat to initiate proceedings against Law Enforcement Officials—they instead pertain to immigration policy choices that the Governor has allegedly made. Absent any further facts that connect these actions to an imminent threat of prosecution of Law Enforcement Officials, such conclusory claims are inadequate for standing purposes. The same goes for Plaintiffs' reference to Defendant Attorney General Robert Bonta's press release informing the people of California of their rights regarding immigration. [*Id.* at 170–71]. Additionally, as Defendants point out, Executive Order 14287 and the Department of Justice memoranda that Plaintiffs cite cannot be classified as specific warnings or threats to initiate proceedings. [Opp. at 7, 11–13].

Neither have Plaintiffs demonstrated a history of past prosecution or enforcement. Law Enforcement Officials have not shown that the State of California, not other states, has criminally prosecuted individual law enforcement officials for their violation of SB 54. The Opposition references federal criminal charges against a Congresswoman for "attempting to thwart the arrest" of the Newark mayor, accusations that a Wisconsin state court judge escorted an immigrant from her courtroom, or accusations that a New Mexico state judge was housing an undocumented immigrant with gang ties. But these are neither sufficiently similar nor related to the federal government's prosecution of local law enforcement officials for withholding assistance from federal immigration authorities to comply with laws like SB 54. Plaintiffs have not provided, and the Court has not identified, any cases on this issue.

As such, even if the Court were to consider Plaintiff's additional facts in its Opposition, Plaintiffs allegations do not amount to a credible threat of prosecution for Law Enforcement Officials to have standing. Thus, Claims 1 through 5 and 8 through 10 as to the Law Enforcement Officials are **DISMISSED WITHOUT PREJUDICE**.

### B. Eleventh Amendment Immunity as to Claims 6 and 7

Defendants argue that Eleventh Amendment immunity and state sovereign immunity both bar Plaintiffs' state law claims. [Motion at 16]. The Court agrees.[4]

The Eleventh Amendment immunizes states, an arm of the state, its instrumentalities, or its agencies from suits brought in federal courts. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Franceschi v. Schwartz*, 57 F.3d 828, 831 (9th Cir. 1995). This immunity extends to state officers who act on behalf of the state. *NRDC v. Cal. Dep't of Transp.*, 96 F.3d 420, 421 (9th Cir. 1996); *Pennhurst*, 465 U.S. at 101 (1984). Political subdivisions are "citizens" for sovereign immunity purposes. *See City of San Juan Capistrano*, 937 F.3d at 1281.

However, there are three exceptions to this rule: (1) "Congress may abrogate that immunity pursuant to its lawmaking powers"; (2) "a state may waive its Eleventh Amendment immunity by consenting to suit"; and (3) "immunity does not apply when the plaintiff" sues a state official in his or her official capacity for prospective injunctive relief. *Steshenko v. Gayrard*, 70 F.Supp.3d 979, 988–89 (N.D. Cal. 2014); *see Ex Parte Young*, 209 U.S. 123 (1908); *Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir. 1997).

Here, Plaintiffs are "citizens" because they constitute various political subdivisions of the State that they seek to sue. A plain application of the Eleventh Amendment bars these claims. *See City of San Juan Capistrano*, 937 F.3d at 1280.

Nevertheless, Plaintiffs contend these claims are viable based on congressional abrogation or the application of *Ex parte Young*.[5] [Opp. at 19]. The Court addresses Plaintiffs' arguments below and concludes that no exceptions apply.

---

[4] The Court does not discuss state sovereign immunity because its Eleventh Amendment analysis resolves this issue.

[5] The Court notes that Defendant State of California has not consented to this suit, so it is immunized from this action.

### 1. Abrogation

Plaintiffs argue that Congress has abrogated the State of California's sovereign immunity through 8 U.S.C. sections 1373 and 1644 because SB 54 allegedly does exactly what these sections prohibit. [*Id.*]. The Court rejects this argument.

"Congress's intent to abrogate the States' immunity from suit must be obvious from a clear legislative statement." *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 55 (1996) (citation modified). Even a "general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." *Id.* at 56. Instead, "Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute." *Dellmuth v. Muth*, 491 U.S. 223, 227–28 (1989).

Here, however, Claims 6 and 7 do not allege violations of federal statutes that were enacted by Congress. Instead, they allege violations of the California Penal Code and the California Constitution. [SAC at ¶¶ 232, 244]. Thus, there could not have been a clear legislative statement of abrogation in a statute that Congress did not enact. Even if the Court were to consider 8 U.S.C. §§ 1373 and 1644's language to determine whether Congress has abrogated sovereign immunity, language in a federal statute that merely prohibits a state from restricting communications to federal immigration authorities—without any further clear language indicating the vesting of jurisdiction in federal courts—does not indicate obvious and clear legislative intent for abrogation. *See e.g.*, *Seminole Tribe*, 517 U.S. at 56–57 (holding that the following language signaled an "unmistakably clear" statement of intent to abrogate: "The United States district courts shall have jurisdiction over . . . any cause of action . . . arising from the failure of a State to enter into negotiations . . . or to conduct such negotiations in good faith"). Neither section 1373 nor section 1644 contain this type of unequivocal statement that is necessary to abrogate Defendants' Eleventh Amendment immunity. Plaintiffs also do not provide any argument as to why immunity should not apply for Claim 7.

As such, Eleventh Amendment immunity bars Plaintiffs from bringing Claims 6 and 7.

### 2. *Ex parte Young*'s Application to Individual Defendants

Plaintiffs next argue that individual Defendants Governor Gavin Newsom and Attorney General Robert Bonta cannot invoke Eleventh Amendment immunity under *Ex parte Young*, 209 U.S. 123 (1908). [Opp. at 19]. The Court also rejects this argument.

The Ninth Circuit has held that "the *Young* exception does not apply when a suit seeks relief under state law, even if the plaintiff names an individual state official rather than a state instrumentality as the defendant." *Doe v. Regents of Univ. of Cal.*, 891 F.3d 1147, 1153 (9th Cir. 2018) (citing *Pennhurst*, 465 U.S. at 117); *see also Jamagotchian v. Ferraro*, No. 8:22-CV-01893, 2023 WL 2396352 (C.D. Cal. Feb. 7, 2023) (finding that the plaintiff's state law claims against defendant-officials in their official capacities are barred by the Eleventh Amendment).

Here, Plaintiffs concede that Claims 6 and 7 are "fundamentally grounded in State law." [Opp. at 18–19]. Therefore, the *Ex parte Young* exception to Eleventh Amendment immunity also does not apply to individual Defendants, and Claims 6 and 7 are thus **DISMISSED WITHOUT PREJUDICE**.[6]

### IV. CONCLUSION

For the above reasons, the Court **GRANTS** Defendants' Motion to Dismiss **IN ITS ENTIRETY**. All claims are **DISMISSED WITHOUT PREJUDICE** and **WITHOUT LEAVE TO AMEND**. The Clerk is **DIRECTED** to close this action.

**IT IS SO ORDERED.**

---

[6] Because Claims 6 and 7 are barred by the Eleventh Amendment, the Court does not discuss whether it possesses federal question jurisdiction exists over Plaintiffs' state law causes of action.